L. A. Stock Exchange Building (a corporation) v. Commissioner.
L. A. Stock Exch. Bldg. v. Commissioner
Docket No. 2899.
United States Tax Court
1946 Tax Ct. Memo LEXIS 67; 5 T.C.M. (CCH) 910; T.C.M. (RIA) 46238; October 7, 1946
*67 Joseph D. Brady, Esq., 433 S. Spring St., Los Angeles 13, Calif., for the petitioner. Earl C. Crouter, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies of $11,792.84 and $7,938.54 in the petitioner's income tax and excess-profits tax, respectively, for 1938. The issues presented are whether the respondent erred: (1) In determining that the petitioner realized a taxable gain in connection with the receipt and cancellation of certain shares of its capital stock, and (2) in determining the useful life for depreciation purposes of the petitioner's office building and the lobby equipment therein. Findings of Fact Part of the facts were stipulated and are found as stipulated. The petitioner is a California corporation, organized in November 1922 and has its principal place of business in Los Angeles. Its income tax return for 1938 was filed with the collector for the sixth district of California. Facts as to Issue I, acquisition and cancellation of capital stock From the time of organization to December 30, 1938, the petitioner's outstanding stock consisted of 5,000 shares of common *68 stock of a par value of $100 each. On December 30, 1938, prior to its receipt of certain shares of its stock as hereafter related, the petitioner's stock was owned as follows: No. of
shares
Walter P. Story and his wife, Lorenza
L. Story
2,548
T. B. Story, his wife, Katherine F.
Story, and their five children
2,452
5,000 Walter P. and T. B. Story are brothers. At all times material herein the petitioner's principal asset consisted of an office building and the land on which it stands, known as the L. A. Stock Exchange Office Building, located in Los Angeles. The property was acquired by petitioner on March 5, 1923 and from that time until June 30, 1928 was operated by it. On June 30, 1928 the petitioner leased the property to Walter P. Story for a period of 10 years ending June 30, 1938 at a monthly rental of $6,000. Subsequently the lease was cancelled by the joint action of the petitioner and Walter P. Story. On January 1, 1934 the petitioner leased the property to Walter P. Story Company, a partnership consisting of Walter P. Story and his wife, for a period of 15 years beginning on that date, at a monthly rental of $5,500 payable in advance on the *69 first day of each month during the term. All costs of repairs, alterations, changes or replacements during the term of the lease were to be borne by the lessee. The petitioner had the option of terminating the lease upon default in payment of rental or upon the failure of the lessee to perform in other respects. Walter P. Story Company fell behind in the payments of rent and on December 30, 1938, owned the petitioner $196,819.52 on account of past due rents. Of that amount $66,000 represented rent for the year 1938. The petitioner's income tax returns for all years material hereto having been filed on the accrual basis, the $66,000 was reported as income on its 1938 return and remainder of the $196,819.52 was reported in its return for years prior thereto. In determining the deficiencies herein the respondent made no change in the $66,000 as reported in 1938. During 1938 a controversy between the minority stockholders of the petitioner and Walter P. Story, over the failure of the partnership to pay the accumulated accruals of rent, came to a head. Walter P. Story had assumed payment of the indebtedness but he was not in a position to pay it. The minority stockholders were apprehensive *70 that he might otherwise become so financially involved that their interests in petitioner would be jeopardized and being of the opinion that the proper solution of the matter was to effect a termination of his relationship to the petitioner they began negotiations to that end. After considerable negotiations between Walter P. Story and Byron F. Story, a minority stockholder and the representative of the other minority stockholders, it was agreed that Walter P. Story and his wife would transfer and surrender to the petitioner their 2,548 shares of stock in settlement of the controversy. This arrangement was accepted by the minority stockholders not only as a settlement of the indebtedness owing to the petitioner but with the intention that the shares would be cancelled upon their receipt by petitioner. Accordingly on December 30, 1938 Walter P. Story and his wife as first parties, Walter P. Story Company (the partnership), as second party, T. B. Story and wife as third parties, the five children of T. B. Story and wife as fourth parties and petitioner as fifth party entered into a written agreement which was to become effective at the close of business on December 31, 1938. This agreement *71 evidenced a compromise, settlement and extinguishment of all obligations which the first and second parties, or either of them, might have, or claim to have against the third, fourth and fifth parties or any of them and a like settlement and extinguishment of all obligations which the third, fourth, and fifth parties, or either of them, might have, or claim to have against the first and second parties or any of them. Pursuant to the agreement Walter P. Story and his wife surrendered to petitioner the 2,548 shares of stock they owned in it and the shares were forthwith cancelled. The lease dated January 1, 1934 from the petitioner to the partnership was cancelled. Walter P. Story resigned as president of petitioner and as a member of its board of directors. On December 30, 1938 Byron F. Story, his wife and his secretary became the new board of directors of petitioner and took charge of its affairs, with Byron F. Story and his wife as president and vice-president, respectively, and his secretary becoming secretary and treasurer a few weeks later. Since December 30, 1938 neither Walter P. Story nor his wife has participated in the management of petitioner or had any connection with or *72 relationship to petitioner other than that petitioner has acquired steam and hot water for its building from an adjoining building owned by him. At all times since December 30, 1938 the entire outstanding capital stock of the petitioner has consisted solely of the 2,452 shares owned by the minority interest on and prior to said date and said 2,452 shares have continuously since been owned by such minority interest. The petitioner has never at any time throughout its existence owned any shares of stock in another corporation nor has it ever dealt in its own shares as it might in the shares of another corporation. Upon surrender to it of the 2,548 shares of its stock, the petitioner, under date of December 31, 1938, made entries on its books showing a reduction of its outstanding capital stock by $254,800 (par value of 2,548 shares), the elimination from its assets of indebtedness of $196,219.52 owing by the partnership. Walter P. Story Company, and the setting up of a capital surplus account in the amount of $58,580.48 (the difference between $254,800 and $196,219.52) with the statement that the entries were made to reflect the purchase of stock out of capital in accordance with *73 state law. In their 1938 income tax return Walter P. Story and his wife reported a capital loss of $58,480.40 on their shares in the petitioner, which were shown to have been acquired on February 28, 1923 at a cost of $254,700 and sold or exchanged on December 31, 1938 for $196,219.52. The following is a statement for the years 1930 through 1938 of net results of operations of petitioner's building under the leases (Walter P. Story, lessee to 1934 and Walter P. Story Company, lessee 1934 through 1938) after allowance for rentals payable to petitioner under the leases: Net Income
Loss
1930
$45,206.17
1931
$ 8,919.60
1932
25,917.04
1933
33,137.86
1934
22,676.22
1935
19,231.97
1936
16,785.67
1937
52,365.15
1938
26,486.76
As previously shown, the petitioner reported $66,000 as rental income from the lease for 1938. However, no amount was reported with respect to the transaction under which it received and cancelled the 2,548 shares of its capital stock. In determining the deficiency the respondent determined that said shares were received by petitioner as consideration for the cancellation of the lease on the property and the *74 amount of unpaid rentals due thereunder and that petitioner thereby realized a gain of $66,224.48, computed as follows: Value of 2,548 shares at $103 per
share $
262,444.00
* Basis for cancelled
debt
$196,219.52
Basis for cancelled
lease
none
196,219.52
Gain
$ 66,224.48
*75 Footnotes
*. This amount represents accrued and unpaid rentals of $196,819.52 less $600 of accounts receivable from tenants which were assigned to petitioner under the settlement of December 30, 1938. On December 30, 1938, and prior to the cancellation of the rental indebtedness, the petitioner's assets consisted of cash, $2,916.11, the rental indebtedness of $196,819.52, the building and the land on which it stands. The land is a lot approximately 70 feet wide and about 155 feet deep. The land and building are located at 639 Spring Street, three doors north of Seventh Street in Los Angeles. The building was constructed in 1920 and 1921 by Walter P. Story at a total cost of $963,699.83, allocated as follows: building, $793,916.63; lobby equipment, $53,569.62; building equipment, $10,299.81; elevators $95,164.50; air conditioner, $3,705.10; tunnels, $7,044.16. As shown by the balance sheet forming part of its 1938 return the petitioner carried the land on which the building is situated, on its books at $350,000. The building was opened to tenants during 1921 and at all times since has been operated as an office building. The building has 13 stories and a basement and is a Class A (fireproof) building. It is of steel frame and reinforced concrete construction throughout. It is of stucco finish with terra cotta and glazed brick trim. The floors of the hallways and wash rooms are of tile. The roof is of concrete slab construction covered with composition. While the finish of the building is not of as high a type as that of some other office buildings in the locality, the building, structurally, compares favorably with the best office buildings in Los Angeles. The building is of wing type construction, having 3 wings extending over a front of approximately 70 feet and to a depth of about 155 feet. The outside walls are 150 feet in height. Floor and basement heights vary, with the basement having a height of 13 feet, the first floor approximately 23 feet, the second to the twelfth floors approximately 9 feet and the thirteenth floor approximately 9 1/2 feet. There are 3 mezzanine sections on the first floor and the second to the thirteenth floors are typical office floors with from 25 to 30 offices on each floor. By reason of the wing type of construction and the southerly direction in which the wings face as well as the height of the building on an adjacent property, the offices in the petitioner's building from a height of about 30 feet to the top of the building have air and natural light unimpeded by other buildings. Spring Street is an arterial street leading to the civic center of Los Angeles and is the center street of that center. The block of Spring Street in which the petitioner's building is located, between Sixth and Seventh Streets, is well located with respect to travel and transportation facilities. This block is and during 1938 was in the financial district of Los Angeles. For many years this block has been primarily a banking block with the securities business of Los Angeles centered there. While the rear of the ground floor of the petitioner's building was constructed to house the Los Angeles Stock Exchange and the front portion of that floor to house the activities of the Los Angeles office of E. F. Hutton Co., a security company, the remainder of the floors was not particularly designed for use by dealers in securities. Upon completion of petitioner's building, the Stock Exchange and E. F. Hutton Co. moved in. A considerable number of other securities firms also moved in and with increased activities of the securities business during the 1920's, coupled with complete or almost complete occupancy of the building, rentals from the building were quite substantial. Folowing the crash of the stock market in the fall of1929 and during the subsequent depression rentals from the building declined as a result of vacancies and reductions in rental charges. Some time prior to 1931 certain persons financially interested in buildings situated in the vicinity of the petitioner's building and who were desirous of retaining the securities business in that district caused the erection, across the street from the petitioner's building and 3 doors north, of a building constructed for stock exchange purposes only and to be occupied by the Los Angeles Stock Exchange. The petitioner contributed to an undisclosed extent to the construction of that building. The building opened in January 1931 and the stock exchange moved out of petitioner's building and into the new one. E. F. Hutton Co., which had occupied the front part of the ground floor space and considerable space on the upper floors of petitioner's building and for all of which it was paying in excess of $3,000 per month, moved out in the early part of 1931. It moved into a recently completed air-conditioned building located in the same block as petitioner's building and two doors north. One of the 10-room spaces that E. F. Hutton Co. occupied and for which it had paid a rental of about $500 a month continued to remain vacant until the end of 1938 except for a period of 19 months during which it produced a rental of $2,221. Banks-Huntley Co., investment bankers and stock brokers were tenants in petitioner's building from the spring of 1921 until the fall of 1930. At the latter time they moved into their own recently completed air-conditioned, first-class building situated across the street from the petitioner's building and one door north. For the space occupied in petitioner's building the company paid $2,500 or $2,600 a month. During the late 1920's the rental per year per square foot of the rentable space in the petitioner's building averaged around $3 per square foot with a total occupancy. At the end of 1938 the average was about $1.74 per square foot with an occupancy of about 80 per cent. The average rental and the occupancy percentage at the end of 1938 compared favorably with those of other buildings in the locality, being higher rentals than those of some buildings which were either better finished or better located. By the end of 1941 the average rental was about $1.50 per square foot with an occupancy of about 71 per cent. So far as disclosed these compared favorably with those of other buildings in the locality. Since that time the occupancy percentage has increased considerably. At the end of 1938 all of the property on both sides of Spring Street between Sixth Street and Seventh Street was improved except the lot adjacent to the petitioner on the north which had a 60-foot frontage and was used for a parking lot. On December 30, 1938, the combined value of the petitioner's land and building was $525,000. The petitioner's liabilities on December 30, 1938, aside from capital stock, were as follows: Mortgage
$327,500.00
Accrued interest
614.06
Accrued federal income and excess
profits tax
1,869.38
Accrued capital stock tax
60.00
Total
$330,043.44 The unpaid principal balance of petitioner's mortgage indebtedness, $327,500, was subject to an amortization requirement of $2,500 per quarter, or $10,000 per annum, with the remaining balance due September 17, 1946. The interest payable on the mortgage indebtedness was at the rate of 4 1/2 per cent per annum. On December 30, 1938, and prior to the cancellation of the rental indebtedness, the book value of the petitioner's 5,000 shares of capital stock was $78.12 per share. During the five-year period 1923 through 1927, the petitioner paid dividends on its stock as follows: Year
Per Share
1923
$2.00
1924
7.40
1925
7.20
1926
7.20
1927
1.80 After 1927 and throughout 1938 no further dividends were ever paid. The following is a statement of petitioner's gross income, deductions (with corrected deduction for local taxes), net income without deduction for income and excess profits taxes, amount of federal income and excess profits taxes, and declared value of capital stock, as reported on its federal income and excess profits tax returns for the years indicated: 1934
1935
1936
1937
1938
Gross income
$66,000.00
$66,000.00
$66,000.00
$66,045.00
$66,000.00
Deductions
Taxes
15,681.15
16,885.99
18,045.29
20,005.18
20,542.64
Interest
17,979.53
17,822.94
17,552.07
14,776.50
15,050.29
Depreciation
26,194.37
27,249.57
27,108.15
22,661.19
19,759.94
Miscellaneous
50.50
11.00
955.10
$59,855.05
$62,009.00
$62,716.51
$58,397.97
$55,352.87
Net income
6,144.95
3,991.00
3,283.49
7,647.03
10,647.13
Income and
excess profits tax
713.79
569.09
640.50
none
1,869.38
Declared value of
capital stock
50,000.00
55,191.23
50,000.00
54,041.22
50,000.00 The petitioner's net income for the years immediately following 1938 was less than in 1938 or in 1937. In 1939 the petitioner's mortgage loan became delinquent due to petitioner's failure to meet the amortization requirement of $10,000 per annum. The fair market value on December 30, 1938 of the 2,548 shares of its capital stock received and cancelled by the petitioner on that date was not in excess of $77.01 a share, or a total value of $196,219.52. Opinion as to Issue I, acquisition and cancellation of capital stock The position of the petitioner with respect to this issue is that the respondent erred (1) in failing to determine that the petitioner received and cancelled the 2,548 shares of its stock in a transaction constituting a distribution of the rental indebtedness in the amount of $196,219.52 in partial liquidation in complete cancellation of said shares, from which no gain or loss was realizable, and (2) in failing to determine that the fair market value of the 2,548 shares was not in excess of $196,219.52. Relying on , certiorari denied, , and other cases stemming therefrom, the respondent contends that a corporation may realize a taxable gain upon the receipt and cancellation of its stock where, upon the cancellation of an obligation or obligations owing to it, it acquires stock of a value in excess of the obligation. He urges that the petitioner received the 2,548 shares of its stock in payment of the cancellation of the lease and the payment of the unpaid rentals due thereunder, and that the value of $262,444, or $103 a share, for the stock and the gain on the transaction of $66,224.48, as determined by him, should be sustained. While there are differences in the factual situation in this case and that in S. A. Woods Machine Co. which, to say the least, could furnish the basis for an argument that the two cases are distinguishable and that the rule of S. A. Woods Machine Co. does not apply here, we find it unnecessary to consider and decide that point. Upon consideration of the evidence, we have concluded and found as a fact that the 2,548 shares of petitioner's capital stock received from General and Mrs. Story and cancelled under the circumstances outlined in our findings had a fair market value on December 30, 1938 of not in excess of $77.01 a share, or a total value of $196,219.52. In such circumstances, whether we sustain the contention of the petitioner that the transaction was a partial liquidation on its part and therefore a transaction in which it realized neither gain nor loss, or whether in accordance with the respondent's contention we hold that the transaction was a payment to petitioner in its own stock of the past due rent, the tax result is the same and no income was realized by petitioner. The respondent contends that the shares of stock at the time of their surrender had a fair market value of $103 per share. Petitioner, on the other hand, contends that the aggregate fair market value of the 2,548 shares did not equal the accumulated rent of $196,219.52 owed by the Storys at the time they surrendered their stock. From statements made by counsel for respondent at the hearing and on brief, it appears that his determination of a value of $103 per share for the stock was predicated on the conclusion that the book or asset value of the stock was approximately that amount per share. In reaching that conclusion a total value of $645,848.95 was assigned to the petitioner's land and building, its only assets of importance aside from the rental indebtedness. Of that value, $245,000 was ascribed to the land and $400,848.95 to the building. Considerable evidence, including opinion testimony directed towards the value of the land and building, was offered by each of the parties. One witness for the petitioner expressed the opinion that the value of the land was $175,000 and that of the building was $250,000, or a total of $425,000. Another witness for the petitioner testified to a combined value of the land and building of $435,000. One witness for the respondent was of the opinion that the land had a value of $245,000, the building $355,000, or a total of $600,000, while another witness for the respondent valued the land at $245,000, the building at $390,575, or a total of $635,575. From a consideration of all the evidence on this point, we have concluded and found as a fact that the combined value of the land and building on December 30, 1938 was $525,000. Respecting the value of the rental indebtedness of $196,819.52 owing to the petitioner, a witness for the petitioner expressed the opinion that it should be classed as doubtful and that it therefore had a market value of only 75 per cent of the face amount thereof. Since Walter P. Story, the minority stockholders and the petitioner appear to have treated the item at its face amount in their settlement, we have likewise so treated it in arriving at the book value of approximately $78 per share for the petitioner's stock on December 30, 1938, as set out in our findings of fact. Considerable other evidence was also submitted by the parties as to the fair market value of the petitioner's stock on December 30, 1938. One of petitioner's witnesses expressed the opinion that such value was $10 per share, while the testimony of another witness of petitioner was to the effect that the value was $51.28 a share. None of the respondent's witnesses expressed an opinion as to the value of the stock. Considering the earnings record of the petitioner for 1938, and the years immediately preceding in connection with the requirement of its mortgage indebtedness that the principal amount thereof was to be amortized at the rate of $10,000 annually, it is apparent that a purchaser of petitioner's stock would have been faced with the fact that unless the stockholders advanced money to the petitioner or it was otherwise able to borrow for such purpose, which was an unlikely possibility, the petitioner would default in the payments required by the mortgage. A default actually occurred in 1939. After weighing all the relevant evidence, including asset value, history of earnings, the petitioner's financial situation on December 30, 1938, and its prospects at that time for the future, we have found as a fact that the value of the petitioner's stock on December 30, 1938 was not in excess of $77.01 a share, and that the value of the 2,548 shares of its stock received and cancelled on that date was not in excess of $196,219.52, the amount of the rental indebtedness cancelled by the transaction. It accordingly follows that the petitioner realized no taxable income on the transaction whether the petitioner's theory or the respondent's theory of the nature or character of the transaction be regarded as correct. Facts as to Issue II, useful life of petitioner's office building and lobby equipment The facts as to the location, type, character, rentals, and the prospective future life of the petitioner's building, having also been pertinent to Issue I, were set out in our findings of fact on that issue and will not be restated here. In the depreciation schedule forming part of its 1938 return the petitioner showed a basis of $793,916.64 for depreciation of its office building and the accumulated and allowable depreciation thereon for 1937 and prior years as $317,093.39, thus leaving $476,823.25 as the amount of the undepreciated portion of the basis. On the foregoing basis and using 45 years from the completion of the building in 1921 as its useful life the petitioner took a deduction of $17,863.12 in its 1938 return for depreciation on the building. In determining the deficiency the respondent accepted the $476,823.25 undepreciated portion of the basis of the building as the adjusted basis as of January 1, 1938, determined that the building had a useful life of 50 years from 1921 or 33 years from January 1, 1938, and disallowed $3,413.93 of the deduction of $17,863.12 taken by petitioner for 1938. In the depreciation schedule the petitioner showed a basis of $53,569.62 for depreciation of its lobby equipment and the accumulated and allowable depreciation thereon for 1937 and prior years as $14,265.50, leaving $39,304.22 as the amount of the undepreciated portion of the basis. On the foregoing basis and using 45 years from 1921 as the useful life of the lobby equipment the petitioner took a deduction of $1,205.31 in its 1938 return for depreciation thereon. In determining the deficiency the respondent accepted the $39,304.22 undepreciated portion of the basis of the lobby equipment as the adjusted basis as of January 1, 1938, determined that the equipment had a useful life of 50 years from 1921 or 33 years from January 1, 1938, and disallowed $14.27 of the deduction of $1,205.31 taken by petitioner for depreciation. No change was made by the respondent in the deductions taken by petitioner for depreciation on its other depreciable properties. The original total tax liability shown by petitioner on its 1938 return was paid to the collector at Los Angeles as follows: Date
Amount
3/15/39
$ 467.35
6/14/39
467.35
9/12/39
467.34
12/12/39
467.34
Total
$1,869.38 On or about July 23, 1940, the petitioner also paid to the collector $833.74, together with interest at 6 per cent thereon as provided by law. On October 26, 1940 the petitioner filed with the collector a claim for refund of 1938 taxes in the amount of $1,663.57 based on the stated ground that the true economic life of its depreciable assets was 23 years from January 1, 1938. The claim was denied in the final determination of the deficiency involved herein. The useful life of the petitioner's building was 50 years from 1921 and 33 years from January 1, 1938. The useful life of its lobby equipment was the same as that of the building. Opinion as to Issue II, useful life of petitioner's office building and lobby equipment On this issue no question is presented as to basis for the two properties involved. The only question is what was the useful life of the properties. In its return the petitioner used a life of 45 years from the completion of construction of its building in 1921 or 28 years from January 1, 1938. The respondent determined a life of 50 years from 1921 or 33 years from January 1, 1938. Relying strongly on the decline in rentals since the late 1920's which, however, was not peculiar to petitioner's building, the petitioner now contends that the life of the properties was not in excess of 40 years from 1921, or 23 years from January 1, 1938, and that it is entitled to depreciation allowances computed accordingly. Considerable evidence was submitted as to the type and character of the building, its comparison with other buildings in the same locality, the rentals from it and other buildings and its prospective future physical and useful life. Witnesses offered by the petitioner expressed opinions as to a useful life of the building from the completion of construction in 1921 of 40 and 47 years, with its witness shown to have the broadest experience in real estate matters placing its useful life at 47 years from 1921 or 30 years from the beginning of 1938. The testimony of witnesses offered by respondent was to the effect that the useful life of the building was 50 years from 1921. After carefully considering the foregoing, together with all other evidence bearing on the question, we have found as a fact that the useful life of petitioner's building was 50 years from 1921 and 33 years from January 1, 1938. Since the record contains nothing to indicate that the useful life of the lobby equipment will be shorter than that of the building, we have found as a fact that it had the same life as that of the building. In view of the foregoing the respondent's action on this issue is sustained. Decision will be entered under Rule 50. ↩